**Manja T. BRONNER**

v.

**Arthur I. GOLDMAN, Nathan Brezner, Murray R. Fine, Edith R. Katz, Arnold Goodman and Kate Katz, Copartners under the name and style of Roberts & Co.**

**Civ. A. No. 61-374.**

United States District Court
D. Massachusetts.

Dec. 30, 1964.

Mark M. Horblit, Samuel H. Kalish, and Peter R. Tritsch, Boston, Mass., for plaintiff.

Charles R. Goldstein, Henry M. Leen and Thomas J. Carens, Boston, Mass., for defendants.

CAFFREY, District Judge.

This is a civil action brought by plaintiff against a group of individuals who are co-partners doing business as Roberts & Company. Jurisdiction is alleged to exist on the basis of 15 U.S.C.A. § 78aa. Plaintiff seeks rescission of a promissory note which she executed on December 14,

714

1959, payable to the order of Roberts & Company, in the amount of $184,242.34, money damages, and other relief. The circumstances attendant upon the execution of the note are set out in full infra. The case was tried to the Court. I find and rule as follows:

Plaintiff, Manja T. Bronner, sometimes known as Manja Tritsch, is a resident of Boston, Massachusetts. She became the owner of a ladies' apparel retail business called "The Gray Shop" in 1941. She owns substantially all of the stock therein and has managed it since that time. The Gray Shop operated one store in Boston and one in Falmouth, Massachusetts. The gross volume of the two stores for the calendar year 1959 was approximately $300,000. In her business plaintiff is accustomed to making seasonal loans for business purposes from the First National Bank of Boston. She testified on deposition that she had been a more or less constant and avid reader of the financial news, including the Wall Street Journal, for a period of four years, and that she was always interested in economics and finance. The record indicates that both prior to and following the transactions with duPont, Homsey & Company which gave rise to this action she did business with other brokerages, beginning in 1953. These included Burgess & Leith, where she had between 7 and 10 transactions; Hertz & Company in New York; Morton Seidel in Los Angeles; Merrill Lynch in Boston, where she had 24 transactions; and H. C. Wainwright & Co. in Boston, where she had about 32 transactions in 1959 and 1960.

Plaintiff became a customer of duPont, Homsey & Company in July 1958, and shortly thereafter made the acquaintance of Anton E. Homsey who acted as the firm's customer's man in connection with her account. He also served as one of her investment advisers until about September 1, 1960. During this period she actively traded in a variety of stocks through the duPont, Homsey & Company office.

Defendant's Exhibit A, a schedule of all plaintiff's dealings with duPont, Homsey & Company, indicates that prior to the transaction of December 14, 1959 complained of herein, involving 2,000 shares of American Motors, Mrs. Tritsch bought a total of 8,200 shares of American Motors and sold a total of 7,500 shares of American Motors, realizing a profit therefrom of about $38,740.00.

The record indicates that in March 1959, plaintiff borrowed $98,000 from the Boston Safe Deposit & Trust Company to finance a joint venture with Anton E. Homsey in the purchase of American Petrofina stock, and the record also shows that on June 3, 1959, plaintiff borrowed $32,000 from the First National Bank of Boston to finance the purchase of 1,000 shares of Lorillard through the office of duPont, Homsey & Company.

Although plaintiff testified at the trial, "I relied on Mr. Homsey one hundred per cent because he was a member of the Stock Exchange and he was an adviser to other women, too," she conceded in other portions of her testimony that she signed a letter dated March 21, 1959 addressed to the President of American Petrofina Company which contained the statement, "I am a business woman who realizes the risk involved in investing money." She also conceded that while urging Homsey to sell some of her holdings in American Motors in the Spring of 1960 she in fact bought through another brokerage blocks of 50 and 100 shares of American Motors.

The foregoing makes it abundantly clear that plaintiff was, and is, an experienced business woman who, in 1959, was familiar with American business practices and the use of borrowed money to finance both purchases of inventory for her business and to finance speculation in the stock market; that she had borrowed money on several occasions prior to the December 14 transaction for speculative investments; that she was an active trader in the stock market; and that she had entered into a prior joint venture with Homsey for 9,200 shares

of American Petrofina in March of 1959 which was substantially identical in its terms to the joint venture with Homsey of December 14, 1959 which resulted in this lawsuit.

The defendants are residents of Massachusetts who have been engaged in the money-lending business as co-partners under the name and style of Roberts & Company since April 1959. Arthur L. Goldman at all material times has been the managing partner of the company. For some years prior to December 14, 1959, Anton E. Homsey, a resident of Massachusetts, was a member of the New York Stock Exchange, owner of a seat thereon, and the senior and managing general partner of the stock brokerage firm duPont, Homsey & Company, which had usual places of business in Boston and elsewhere. Homsey is not a defendant herein but the complaint alleges him to be a co-conspirator with Goldman.

On various occasions prior to December 1959, Roberts & Company had made loans of money either to Homsey or to nominees or straws for his use and benefit. The purpose of these loans was to enable Homsey to purchase marketable securities for his own account. These loans were made to him at interest rates of from 12 to 15 per cent per annum and were secured by stock certificates delivered to Roberts & Company by Homsey. The stock certificates so pledged represented shares of stock in companies qualified and listed for trading on one of the national securities exchanges. The loans by Roberts & Company to Homsey were outstanding and unpaid during the year 1959 and a major portion of 1960.

The first loan made by Goldman to Homsey was on February 12, 1959, in the amount of $34,000. This loan was made by Investment Funds, Inc., a company with which Goldman was associated prior to the formation of Roberts & Company. The first loan made by Roberts & Company to Homsey was in August of 1959 in the amount of $150,000. This loan was secured by 1400 shares of American Motors, 1000 shares of Crucible Steel, 200 shares of General Time, 200 shares of Hoffman Electronics, 100 shares of Lukens Steel, 500 shares of Siegler Corporation, 300 shares of Thiokol Chemicals and 400 shares of Universal Cyclops.

Investment Funds, Inc. made a loan totaling $39,000 to three individual customers of duPont, Homsey & Company. These loans were "taken over" by Roberts & Company on April 1, 1959 and Homsey also guaranteed to Roberts & Company the payment of these three loans through a letter written in October 1959.

On November 25, 1959, while the above loans were still outstanding and unpaid, Roberts & Company made a loan to Homsey in the amount of $181,961 which was due in one week, i. e., December 2, 1959, and it was the intention of the parties that the loan would be secured by 2,000 shares of common stock of American Motors Corporation. In exchange for Roberts & Company's check for the $181,961, dated November 25, 1959, Homsey executed two documents which were admitted in evidence:

(1) a receipt for the check written on a blank piece of paper, which read:

"Received from Roberts & Company check in the sum of $181,-961.00. On or before December 2, 1959, we promise to deliver to you 2,000 shares of American Motors in negotiable form."

(2) a letter on the letterhead of duPont, Homsey & Company, dated November 25, 1959, addressed to Roberts & Company, which read:

"In consideration of your effecting payment in the amount of $181,961.00 representing the cost of 2,000 American Motors Corporation, this firm unconditionally guarantees to present payment to you on Wednesday, December 2, 1959, the sum of $183,325.71. Thanking you for your cooperation in this respect, we remain."

Both of the above-quoted documents were signed, "duPont, Homsey & Company by Anton E. Homsey, General Partner." Apparently no note was executed to evidence this transaction. In any event, no note for $181,961 was produced at the trial.

On December 2, 1959, Homsey did not repay the November 25 loan and by that date Roberts & Company had received from him only 1,000 shares of American Motors. On December 2, in lieu of full payment of the November 25 loan, Roberts & Company accepted a promissory note of Homsey in the face amount of $183,325.71. This note was payable on demand, with interest at the rate of 1¼ per cent per month. It recited that 2,000 shares of American Motors had been deposited with Roberts & Company as collateral security. The note contained a provision that the maker would deliver additional securities to the satisfaction of Roberts & Company should the market value of the 2,000 shares decline, and also contained a clause that "the undersigned hereby authorizes Roberts & Co., if Roberts & Co. should desire, to hypothecate the above-listed securities for the account of Roberts & Co." Roberts & Company did not receive delivery of the balance of the 2,000 shares until about January 15, 1960.

In the early part of December 1959, Goldman, as the managing partner of Roberts & Company, became concerned about Homsey's ability to repay the company the total amount of his indebtedness to them, $333,325.00 (the August loan of $150,000 and the November 25 loan of $183,325). Some time between December 2 and December 14, Goldman discussed with Homsey the fact that Homsey's outstanding indebtedness to Roberts & Company had grown to a figure in excess of $330,000, the fact that he was concerned about Homsey's ability to repay, and inquired about the possibility of Homsey's providing additional security for this outstanding indebtedness or, in the alternative, Homsey's attempting to get one of his clients to "take over" this obligation. Homsey indicated to

Goldman that he was unable to produce additional collateral from his own assets but that he would investigate the possibility of having one of his clients "take over" the loan. Shortly thereafter Homsey proposed to Mrs. Tritsch that she "purchase" from him the 2,000 shares of American Motors on a basis strikingly similar to the joint venture that she and Homsey had previously entered into involving 9,200 shares of American Petrofina. Mrs. Tritsch indicated to Homsey a willingness to enter into such a transaction. Although this transaction was referred to in the testimony as a "purchase," I rule that it was a joint venture, under the terms of which Mrs. Tritsch was to execute a promissory note to Roberts & Company and turn over certain certificates of stock known by Homsey to be included in her portfolio as additional security for the note over and above the 2,000 shares of American Motors. Homsey agreed to save her harmless from any loss in the transaction and to pay the interest charges on the loan. They agreed to split any resulting capital gain fifty-fifty, but unlike the prior transaction they agreed that plaintiff was to get all dividends earned by the 2,000 shares during the life of the joint venture. Homsey reported to Goldman that he had found a client willing to "take over" his loan and Goldman told Homsey that Mrs. Tritsch was acceptable to Roberts & Company. An appointment was then made for plaintiff, Homsey and Goldman to meet at Homsey's office on December 14 to consummate the transaction.

Pursuant to a prior telephone conversation with Homsey, Goldman brought to this meeting a form of promissory note to be executed by Mrs. Tritsch, in favor of Roberts & Company, in the amount of $184,242.34, and a check of Roberts & Company in the amount of $184,242.34 payable to Mrs. Tritsch, together with a form letter prepared by Goldman and addressed to Roberts & Company for the signature of Mrs. Tritsch. The letter, dated December 14, requested Roberts & Co. or its nominee to receive from du-

Pont, Homsey & Company the following securities:

300 shares Alleghany Corp.
200 shares American Motors
2200 shares American Petrofina
50 shares American Radiator & Std. San.
100 shares NY Chic & St.Louis
100 shares Chrysler Corp.
300 Graham Paige
50 Jones Laughlin Steel
100 P. Lorillard
50 Pan American World Airways
85 Pennsylvania Railroad
100 Steel Company of Wales
200 Schick Inc.
300 Seeburg Corp.
700 Studebaker-Packard
163 Television Electronics Fund
50 Union Pacific
62 Unilever
50 Universal Oil Products
100 Tanganyika Concessions
400 Webb & Knapp
100 Genl. Instrument
100· Genl. Time
100 Cr. Coll.
100 NARDA

Another letter brought to the meeting by Goldman likewise was dated December 14 and addressed to duPont, Homsey & Company, and prepared for the signature of Mrs. Tritsch. It stated:

"Will you or your nominee please deliver to Roberts & Co. the following securities: *2000 shares American Motors Corp. of which 1,000 have already been delivered.* Plus the securities on the appended list."

(Emphasis added.)

(No list was appended to the letter when it was put in evidence.) There was testimony that the list referred to was the same as that appended to the note.

Homsey introduced Mrs. Tritsch to Goldman. Goldman gave the note and the two letters to Mrs. Tritsch. Mrs. Tritsch read the note and letters. Prior to her signing the note Goldman explained to her that the note was a promissory note payable on demand, and that the collateral was 2,000 shares of American Motors and the other securities on the list appended to the note. He did not say anything at this time about the existence of loans from Roberts & Company to Homsey. Goldman told Mrs. Tritsch that he had received 1,000 of the American Motors shares and expected the balance within a few days. Mrs. Tritsch was given the check for $184,242.34. She signed her endorsement on the back thereof, placed the check on Homsey's desk and left the meeting.

When put in evidence at the trial this check bore the typewritten words: "Pay to the order of: Roberts & Co." above the endorsement of Mrs. Tritsch and a rubber stamp endorsement: "For Deposit Only Credit Account of Roberts & Co." immediately below her endorsement. At the trial Mrs. Tritsch said she thought that the typewritten words were already on the check when she endorsed it. However, the physical appearance of the check is such that the typing could have been added after her endorsement. The fact that the typed endorsement was put on in two lines is consistent with its having been deliberately typed in that manner, rather than in one line, to avoid typing over or into the upper portion of the letter "T" in the handwritten word "Tritsch." I am not persuaded that the typewritten endorsement was on the check at the time Mrs. Tritsch endorsed it, and I find that Mrs. Tritsch, who believed that as part of the joint venture she was buying 2,000 shares of American Motors from Homsey personally, endorsed the check in blank and delivered it to Homsey in the expectation that he would use it to purchase 2,000 shares of American Motors through the New York Stock Exchange just as he had purchased the 9,200 shares of American Petrofina through the American Stock Exchange. Mrs. Tritsch was not aware at this time that Homsey had already purchased 2,000 shares of American Motors with the $181,961 proceeds of the November 25 check from Roberts & Company. (Just what significance, if any, she attached to the recital in the note she signed that 1,000 shares of American

Motors had *already* been delivered to Roberts & Company remains a mystery since no testimony was offered on this point.) Nor was she aware that in addition to being a joint venturer with her in this December 14 transaction Homsey was acting as a principal in selling his own 2,000 shares to him and her as joint venturers, in contrast to the role he played in the American Petrofina joint venture where he acted as agent for him and her in buying the 9,200 shares in the open market. Homsey then turned over to Goldman the check endorsed in blank by Mrs. Tritsch in payment of his note of December 2 to Roberts & Company in the amount of $183,325.71, plus one month's interest at the rate of 1¼ per cent per month. A copy of the December 2 note stamped "cancelled" was placed in evidence at the trial and Goldman testified with reference to this note, "I believe that note was cancelled out by a later transaction." I infer that the "later transaction" was that of December 14, 1959.

For a number of months after December 14, 1959, normal business relations between the parties continued. As provided for in the December 14 note, Roberts & Company requested additional collateral and received from Homsey 100 shares of General Time in April 1960, 100 shares of Crowell-Collier in May 1960, 100 NADA and 300 Schick in June 1960, and 100 General Instruments in August 1960. All of these securities were owned by Mrs. Tritsch. Consistent with his verbal promise to do so, Homsey paid Roberts & Company $12,820.20 on July 6, 1960 which was credited as interest on the note signed by plaintiff. In addition to the foregoing, Mrs. Tritsch made a short-term personal loan to Homsey in the amount of $27,000 through the medium of two checks, one for $15,000 and one for $12,000, both dated February 25, 1960.

The disagreement between the parties arose when the New York Stock Exchange suspended Homsey individually and duPont, Homsey & Company on September 9, 1960, and expelled them from the Exchange on September 28. On September 17, 1960, a Receiver for each of them was appointed by another Judge of this court upon a petition filed by the Securities and Exchange Commission. This receivership is currently pending. Homsey pleaded guilty to criminal violations of the Securities and Exchange laws and was sentenced to a term in prison.

After Homsey's downfall, Roberts & Company for the first time looked to plaintiff for interest payments due on the note and in default thereof called the note and ultimately disposed of the collateral, applying the proceeds thereof in reduction of plaintiff's obligation on the note. Application of the collateral left a deficiency of $26,155.90 which was reduced to $16,155.90 by reason of a $10,000 payment by the New York Stock Exchange. As part of the pre-trial proceedings in this case, this Court denied plaintiff's application for an injunction against Roberts & Company's efforts to obtain a judgment on this note against plaintiff herein in an action it caused its straw, present holder of the note, to commence in the Massachusetts Superior Court.

In her complaint, as amended, plaintiff charges defendants with violations—either directly or indirectly by virtue of theories of aiding and abetting or conspiratorial activity—of the following provisions of the Securities Exchange Act of 1934: Section 7(c) and (d) (15 U.S.C. § 78g(c) and (d)); Section 8(c) (1) (2) (3) (15 U.S.C. § 78h(c) (1) (2) (3); Section 9 (15 U.S.C. § 78i); Section 10 (b) (15 U.S.C. § 78j(b); and Rule 10b–5 (17 C.F.R. Sec. 240.10b–5).

In addition, plaintiff alleges a common law conspiracy to defraud or deceive her, conversion of her collateral, wrongful commingling of her collateral, neglect of her collateral, and a general failure of the defendants as pledgees to account to her or treat her in an equitable manner.

As indicated above, plaintiff testified, with specific reference to the December 14, 1959 transaction which is the basis of this lawsuit, "I relied on Mr. Homsey one hundred per cent because he was a mem-

ber of the stock exchange and he was an adviser to other women, too." Homsey is not named as a defendant herein, presumably because during the course of the federal court receivership an injunction was issued preventing the bringing of suits against him. Whatever may be the legal relationship as between plaintiff and Homsey, because of the role Homsey played in the events leading up to and subsequent to the December 14 transaction, I rule that plaintiff has failed to sustain her burden of proving any wrongdoing toward her on the part of Goldman or any other member of Roberts & Company. No conspiracy has been proved between Goldman and Homsey, and I am not persuaded that Goldman aided or abetted Homsey in any wrongful acts which Homsey may have committed with regard to the plaintiff.

I rule that neither Goldman nor any other member of Roberts & Company is a member of a stock exchange, a broker, or dealer, as defined in 15 U.S.C. § 78c; nor was Goldman or any other member of Roberts & Company a bank or otherwise standing in a fiduciary relationship toward plaintiff at any material time. Plaintiff has failed to prove that any fraud has been practiced on her by any member of Roberts & Company, that any unauthorized withdrawal of any of her collateral has taken place, or that she has suffered any damage as a result of any allegedly wrongful commingling of her stock or as a result of any allegedly wrongful rehypothecation of her stock by Roberts & Company.

In summary, I rule that plaintiff, a successful business woman, thoroughly experienced in trading in the stock market, entered into a joint venture with Anton E. Homsey on December 14, 1959, fully aware of the financial risks involved, and that she was perfectly satisfied with the status of this joint venture from December 14, 1959 until early September 1960, when for the first time it became apparent that Homsey no longer had the financial ability to pay the interest due on her note or to save her harmless againt the decline in value of the pledging securities. On the record of this case I rule that if plaintiff has any complaint it is not against Goldman or any other member of Roberts and Company.

Judgment for the defendants.